[602 NYS2d 623]

In the Matter of ALICE C., Respondent, v BERNARD G. C., Appellant.

Second Department, September 27, 1993

APPEARANCES OF COUNSEL

*Banno & Guardino,* Mineola *(Carl C. Banno* of counsel), for appellant.

*Marlo & Liebert,* Garden City *(Lisa K. Liebert* and *Martha S. Weisel* of counsel), for respondent.

**OPINION OF THE COURT**

EIBER, J.

Although a parent's duty to support his or her child until the child reaches the age of 21 years is a matter of fundamental public policy in New York, it has long been recognized that a child may be deemed emancipated, and thus forfeit the right to support, where the child voluntarily and without sufficient cause leaves the parent's home and withdraws from parental control and guidance *(see, Matter of Roe v Doe,* 29 NY2d 188). On this appeal, we are asked to consider whether a child who left his father's home following a heated argument to live with his mother, and thereafter had little contact with his father, emancipated himself through his conduct, thus relieving the father of his obligation of support. For the reasons which follow, in the present case we reject the father's contention that his son was emancipated, and conclude that the father remains obligated to provide support for his child.

I

The petitioner Alice C. married the respondent Bernard C. in the State of Michigan on May 1, 1954, when she was 21 years old. Bernard, who was serving in the Navy when he and Alice were first married, subsequently earned his undergraduate degree at the University of Michigan, and attended medical school. The couple later relocated to New York, and had five children: four daughters and one son. In July 1982 after more than 28 years of marriage, Bernard and Alice separated. The parties were thereafter divorced by judgment dated July 31, 1984. In accordance with a stipulation of settlement dated February 3, 1984, which was not merged in the judgment, custody of the parties' two youngest daughters, 16-year-old Amanda and 9-year-old Alexandra, was awarded to the petitioner mother. Custody of the parties' 13-year-old son Joseph was, however, awarded to the father, Bernard C. Pursuant to the judgment of divorce, Bernard, a physician specializing in internal medicine, was required to pay Alice maintenance in the sum of $150 per week until she reached the age of 65, and to pay the sum of $150 per week "each for the support and maintenance of the parties' infant children, Amanda and Alexandra". In view of the fact that the father was awarded custody of Joseph, no provision for Joseph's support was included in either the stipulation of settlement or the judgment of divorce.

In May 1986 when Joseph was 15 years old, he and his father became involved in a "confrontation", and as a result, Joseph left his father's home to live with his mother and sisters. Following this change in physical custody, the father began voluntarily making payments of $650 per month directly to Joseph, who turned these funds over to his mother to use for his support. However, the father ceased these payments in April 1989 when Joseph was 18 years old. The mother responded by filing a petition to modify the parties' divorce judgment by requiring the husband, *inter alia*, to pay $250 per week each for the support and maintenance of the two youngest children, Alexandra and Joseph.*

The mother's petition alleged that since entry of the judgment of divorce, "there has been a change of circumstances in that [the] child Joseph has returned to the home of the

---

* Although the mother also sought increased support for Amanda, the Family Court did not consider an upward modification of support for her because Amanda reached the age of 21 years on May 13, 1989.

petitioner on or about May of 1986". She further alleged that there had been "a substantial increase in her expenses such as mortgage, taxes, tuition, utilities and the needs of the children". The father countered by filing a cross petition seeking to reduce the mother's maintenance to $75 per week, and to terminate maintenance in 1990 because "the petitioner has had a substantial increase in her earnings, and the respondent has had a substantial decrease in his net earnings".

## II

A hearing on the parties' respective applications was commenced in July 1989. At the hearing, the father recalled that Joseph came to live with him shortly after the parties' separation, when he was a 13-year-old eighth grade student. The following year, when Joseph entered high school, his parents decided that he should attend a private school, because it was "closer to where we lived", and better suited "in terms of his needs". During Joseph's first year at his new school, he was an "A" student. However, by early 1986 Joseph was "having growing academic difficulties", and had become "an increasing social problem in the classroom". Joseph's academic performance deteriorated progressively during the winter of 1986, and, according to the father, with the decline in school performance, "our own interactions, father-son, which I thought excellent began to deteriorate". The tension in the father's relationship with his son "accumulated" one evening in May 1986 when he and Joseph began to quarrel over a school homework assignment. Although the father's testimony regarding the argument was somewhat vague, he stated that Joseph's tone of voice began to rise, and that the argument was on the point of turning into a physical confrontation when he advised Joseph that he was going to call the police. While his father telephoned the police precinct, Joseph put on his coat and prepared to leave. As Joseph left the residence, his father warned him, "you go out that door, do not come back". Although the father denied that he had "locked" Joseph out of his home, when questioned as to whether Joseph would have been permitted to reside with him following the altercation, he testified as follows:

"[Q.] Was he permitted to return to reside in your house after he left?

"[A.] He came back * * *

"[Q.] No just answer the questions Doctor, yes or no. Was he permitted to reside in your house after that date?

"[A.] In the presence of the police he would have been allowed back in the house, yes madam.

"[Q.] Was he in fact allowed back in the house?

"[A.] The answer is no, not until the police arrived.

"[Q.] He was not yet 18 at that time?

"[A.] That is correct.

"[Q.] He was not employed?

"[A.] He had a part time job with me.

"[Q.] He was not self sufficient?

"[A.] No madam.

"[Q.] So he had to go live somewhere, correct Doctor?

"[A.] He had to live somewhere yes.

"[Q.] After that date did you not make it your * * * you did not assume the responsibility for where he was going to live, is that a fair statement?

"[A.] I had no control of where he was going to live.

"[Q.] But he was not going to live with you guys?

"[A.] He exercised his own control.

"[Q.] OK, but he was not going to live with you?

"[A.] It seemed that way, yes."

The issue of the father's contact with Joseph after he went to live with his mother was touched upon only briefly during the hearing. Asked whether he had maintained contact with Joseph "on a regular basis" since his move, the father responded "I have tried numerous times". He then added, "I believe I saw him once, actually, last summer at his sister's wedding, but we did not speak".

The father additionally testified during the hearing that his business income in 1984, when the parties divorced, was approximately $99,000. Four years later, in 1988, his business income had increased to approximately $123,000.

Joseph C., then 19 years old, also testified at the hearing concerning the events which led him to leave his father's home in 1986. While Joseph maintained that he could not recall the cause of the quarrel which resulted in his move to his mother's home, he denied that he had "in any way threaten[ed] to use [his] hands" against his father during the altercation. Joseph admitted that, immediately following the

argument, he voluntarily left his father's home, and made no efforts to return.

Discussing his relationship with his father, Joseph stated that they "got along superbly" during the first two and one-half to three years that they lived together. Joseph added that he still loved his father, despite their shared tendency to be stubborn. While Joseph admitted that he had made no attempt to contact his father since leaving his father's home, he added that, to the best of his knowledge, his father had made no attempt to contact him.

Joseph additionally testified that he was involved in an accident in 1983 while he was living with his father, and that he was subsequently awarded $41,000 in settlement of a personal injury suit. He received the money on his eighteenth birthday, after obtaining authorization from his father to withdraw the settlement funds. According to Joseph, his father signed the authorization without offering any advice or instruction about how to use the money, and he did not consult with his father about what to do with the funds. After obtaining the funds, Joseph initially placed $15,000 in an account with Merrill Lynch, and spent $13,000 to purchase a new car. He was later involved in two accidents, requiring the expenditure of an additional $7,000 to repair his car. Joseph further testified that he lent $5,000 to a close friend, who failed to pay him back, and that he spent approximately $1,200 on gifts for three of his sisters. Joseph also spent $2,400 to pay for his room and board and books for his first year at Hofstra University, $2,000 for clothing, and about $600 to purchase a video cassette recorder, refrigerator, and television for his dormitory room. At the time of the hearing, no money was left in the Merrill Lynch account.

Joseph entered Hofstra University in the fall of 1988, and registered for 16 credits during the fall semester, and 16 credits during the spring semester. However, he "had a problem with attendance", and ended up dropping all of his spring courses. He earned only six credits during his freshman year, and was placed on academic probation. Hofstra University subsequently agreed that if he attended Nassau Community College for one year, he could return to Hofstra University for his junior year. At the time of the hearing, Joseph was enrolled in Nassau Community College, and was taking 12 credits. He was living at home with his mother, and had only missed one class since the beginning of the semester. Joseph further noted that his tuition at Nassau Community College

had been $765 for the fall semester, and that his mother had paid this fee. Although Joseph was not employed at the time of the hearing, he testified that he had previously held part-time jobs in a movie rental store, and with the Public Safety Department at Hofstra University. No evidence concerning Joseph's earnings from these positions was presented at the hearing.

The petitioner mother Alice C. also testified briefly concerning the circumstances surrounding the change in Joseph's custody. According to the mother, one evening in May 1986 Joseph came to her home and asked if he could live with her because his father had locked him out. She then had a discussion with her son, advising him that if he returned "it would have to be on my terms". On the following day, Joseph removed his possessions from his father's home, and never returned there. Unable to pay Joseph's tuition at his private school, the mother transferred him to West Hempstead High School, after obtaining a signed change of residence form from the father. The mother was not questioned with respect to Joseph's relationship or visitation with his father.

With respect to the financial aspects of her application for an upward modification of child support, the mother testified that when the parties divorced in 1984, she had a part-time position at Hofstra University, and earned about $100 per week. She subsequently obtained a full-time position at Hofstra University, and her salary had risen to $28,885 per year by the time of the hearing. The mother also testified that in the four years following the divorce, most of her monthly expenses including mortgage payments, food, and insurance premiums, had increased, as had Alexandra's tuition and the cost of her music lessons.

At the conclusion of the hearing, the father's attorney urged the Hearing Examiner to conclude that Joseph was emancipated, arguing that he had "declare[d] he * * * is independent" by leaving the custodial residence, and refusing to submit to any form of discipline. The Hearing Examiner rejected the father's argument, instead finding that the father "appears to have washed his hands of his son following an argument in May [1986], and this court is left with no satisfactory explanation as to what exactly happened". The Hearing Examiner also found that the mother had demonstrated significant increases in living expenses for herself and the children, and that the father's income had increased substantially since the divorce. The Hearing Examiner concluded that in

view of these changed circumstances, the father should be required to pay the increased sum of $225 per week in support for the parties' daughter, and $225 per week for Joseph. Although the father subsequently filed objections to the Hearing Examiner's determination, the Family Court agreed that he should be required to provide support for Joseph, finding insufficient proof that he was emancipated.

On this appeal, the father continues to maintain that Joseph emancipated himself by his conduct, which included leaving the father's home "voluntarily", making no effort to return to his father's residence, and not speaking to his father following the May 1986 argument. The father also submits that Joseph's wasteful and irresponsible use of the $41,000 personal injury award establishes his emancipation.

### III

In New York, it "has always been, and remains a matter of fundamental policy * * * that a [parent] of a minor child is chargeable with the discipline and support of that child" until the child attains the age of 21 years (Matter of Roe v Doe, 29 NY2d 188, 192-193, supra). A parent's obligation to support his or her children "in accordance with their needs and his [or her] means" (Matter of Kummer, 93 AD2d 135, 185; see also, Sassano v Sassano, 143 AD2d 893) is codified by Family Court Act § 413 (1) (a), which provides that "the parents of a child under the age of twenty-one years are chargeable with the support of such child and, if possessed of sufficient means or able to earn such means, shall be required to pay for child support a fair and reasonable sum as the court may determine".

Despite the fact that parents have a continuing obligation to support their children until they reach the age of 21 years, it is beyond cavil that emancipation of the child suspends the parent's support obligation. Children are emancipated if they become economically independent of their parents through employment, entry into military service, or marriage, and may also be deemed constructively emancipated if, without cause, they withdraw from parental control and supervision (see, Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 413, at 70; see also, Matter of Roe v Doe, supra).

Turning first to the issue of whether Joseph was emancipated because he was economically independent of his par-

ents, we find that the record contains insufficient evidence to justify a finding that Joseph was self-supporting. While Joseph testified at the hearing that he had previously held two part-time jobs, no evidence regarding his earnings was adduced. Moreover, at the time of the hearing, Joseph was unemployed, was living with his mother, and was attending a local community college as a full-time student (see, Schneider v Schneider, 116 AD2d 714). Thus, it is clear that he was not economically independent of his parents.

We further find that Joseph's dissipation of the personal injury settlement he received when he reached the age of 18 did not render him emancipated. Although Family Court Act § 413 permits a child's resources to be considered in determining the level of support (see, Matter of Avitzur v Rose, 174 AD2d 843), " '[a]bsent evidence of need, children should not be forced * * * to use their funds or diminish their assets' " to supply their basic needs, such as shelter, food and clothing (Malamut v Malamut, 133 AD2d 101, 103, quoting Gold v Gold, 96 Misc 2d 481, 483; see also, Guiry v Guiry, 159 AD2d 556, 557). Thus, a parent is not entirely relieved of his support obligation merely because the child has been awarded a sum of money as compensation for a personal injury. Since the record demonstrates that Joseph had expended the settlement funds prior to the hearing, to deny him support would only serve to cast the entire burden of support on his custodial parent. Moreover, the Court of Appeals has observed that, "delinquent behavior of itself, even if unexplained or persistent, does not generally carry with it the termination of the duty of a parent to support" (Matter of Roe v Doe, 29 NY2d 188, 193, supra; see also, Matter of Toft v Frisbie, 122 AD2d 456). Accordingly, while it is apparent that some of Joseph's expenditures were improvident, they do not form a basis for termination of the parental duty of support.

Having found that Joseph was not economically independent of his parents, we must now consider the second distinct basis upon which a finding of emancipation can be based, namely, withdrawal from parental control. Under this doctrine, which has its origins in the holdings of the Court of Appeals in Matter of Roe v Doe (supra) and Matter of Parker v Stage (43 NY2d 128), a child who is not financially self-sufficient may nevertheless be deemed emancipated if he or she abandons the parental home without sufficient cause and refuses to comply with reasonable parental demands. In Matter of Roe v Doe (supra) the 20-year-old daughter of a New

York attorney disobeyed her father by taking up residence with a female classmate in an off-campus apartment. Upon learning of his daughter's actions, the father cut off all further support and instructed her to return to New York. Ignoring her father's demands, the daughter sold her automobile, and elected to finish out the school year, living off the proceeds realized from the sale. Upon her return to New York, she chose to reside with the parents of a classmate on Long Island. Under these circumstances, the Court of Appeals concluded that the daughter was no longer entitled to support, holding that "where, as in the case at bar, a minor of employable age and in full possession of her faculties, voluntarily and without cause, abandons the parent's home, against the will of the parent and for the purpose of avoiding parental control she forfeits her right to demand support" *(Matter of Roe v Doe, supra,* at 192).

Similarly, in *Matter of Parker v Stage (supra)* the Court of Appeals determined that the Department of Social Services could not compel a father to support his 18-year-old daughter, who had left home, voluntarily and against his wishes, to live with her boyfriend and have a child. In concluding that the daughter was no longer entitled to parental support, despite her eligibility for public assistance, the Court observed: "It should be emphasized that this is not a case of an abandoned child, but of an abandoned parent. There is nothing to indicate that the respondent abused his daughter or placed unreasonable demands upon her. There is no showing that he actively drove her from her home or encouraged her to leave in order to have the public assume his obligation of support. Indeed the contrary appears to be true. The undisputed proof in this record establishes that the father continuously supported his daughter from birth; that he urged her to remain at home and continue her schooling; that he was a forgiving parent who always accepted her back after her absences and that he made efforts to obtain employment for her. We simply hold that under these circumstances the courts below could properly refuse to compel him to pay for her support when she chose to leave home to live with her paramour" *(Matter of Parker v Stage, supra,* at 134-135).

On the other hand, "where the child leaves the home for good cause or with the approval of the custodial parent, [he or] she retains [his or] her right to support from the parent" *(Matter of Monroe County Dept. of Social Servs. v San Filippo,* 178 AD2d 1011, 1012). Thus, for example, in *Matter of Knoll v*

*Kilcher* (100 AD2d 686), where the custodial parent apparently consented to a change in custody, the Appellate Division, Third Department, concluded that the Family Court had erred in denying the father child support for the parties' daughter Stephanie. Stephanie left her mother's home to live with her father, who then filed a petition seeking a change in custody and child support. The Family Court awarded custody to the father, but dismissed his petition for child support because Stephanie had voluntarily left her mother's home, and her father had not encouraged her to return. The appellate Court concluded, however, that support had been improperly denied, noting that "[a]lthough Stephanie voluntarily left her mother's home, at that time she was a 15-year-old high school student and, shortly thereafter, her father applied for a change of custody, which request was approved" *(Matter of Knoll v Kilcher, supra,* at 687).

Furthermore, in *Matter of Drago v Drago* (138 AD2d 704), this Court concluded that a child who left her alcoholic mother and refused her father's demand to attend boarding school or join the military, was not emancipated and remained entitled to support from her father. In *Drago,* we found that the child had made out a clear case of misfeasance and neglect on the part of her parents, noting that she had good cause to leave her mother's home because the mother's alcohol abuse resulted in a tumultuous home environment. While a parent may impose reasonable regulations upon a child in return for his support, we further found that the father's demands that his daughter either attend boarding school or join the military were unreasonable, and that he was not "relieved of his support obligation by excluding the child from his household because of her prior truancy and his belief that she will not abide by his strictures" *(Matter of Drago v Drago, supra,* at 706).

Guided by these principles, we find that the evidence presented at the hearing did not establish that Joseph left his father's home without cause to avoid parental control. To the contrary, during the course of a heated argument, the father told the son that he was calling the police, and warned him that if he left the house, he should not return. Here, when asked whether he would have permitted Joseph to reside with him following the altercation, the father responded, "[i]n the presence of the police he would have been allowed back in the house". Although the mother did not formally apply for a change in custody, it is clear that after the argument, the

father did not want Joseph to live with him, and he effectively consented to the new custodial arrangement by executing a consent form to allow Joseph to change schools. Under these circumstances, we cannot conclude that Joseph left his father's home, or remained away from the home, against his father's will.

Although *Matter of Roe v Doe (supra)* and *Matter of Parker v Stage (supra)*, which created the doctrine of constructive emancipation, involved disobedient children who withdrew from parental control without cause, an additional line of cases has developed which expands the doctrine to encompass a child of employable age who actively abandons the noncustodial parent by refusing all contact and visitation. A leading case in this area is *Cohen v Schnepf* (94 AD2d 783), wherein this Court determined that a father's application to suspend his child support obligation had been properly granted. The father had been denied access to his son for five years. The mother told the father that the son did not want to see him, and during the father's final visit with the son, the stepfather threatened to assault him if he did not leave. Moreover, the son informally used his stepfather's name until he was 18 years old, and then obtained a court order legally changing his name. The son also admitted that communications with his father had not been successful, due in part to his own actions. In concluding that the son had emancipated himself, we noted that he had alienated his father by using his stepfather's name without the knowledge or consent of his father, by admittedly rejecting visitation, and by legally changing his name when he reached the age of 18 years.

In contrast, where it is the parent who causes a breakdown in communication with his child, or has made no serious effort to contact the child and exercise his visitation rights, the child will not be deemed to have abandoned the parent. For example, in *Lipsky v Lipsky* (115 AD2d 361), the father was a physician with a general practice in Coral Gables, Florida, and the son was a full-time student at Brockport State College in New York. Although the son Phillip had been "in regular, if uneasy, contact with his father" following his parents' divorce, "in 1976 while he was away at summer camp, the defendant suddenly moved to Florida with his second wife. He did not inform his son that he was leaving, left no forwarding address, and ceased making any support payments" *(Lipsky v Lipsky, supra,* at 363). Even after the mother discovered the father's whereabouts, no genuine relationship was reestab-

lished between Phillip and his father. The father refused, without explanation, to attend his son's Bar Mitzvah, did not visit his son when he was ill and required hospitalization, did not invite his son to his home in Florida, and did not go to New York to see the boy. The Court concluded that the father had abandoned his son, both financially and emotionally, and could not "now contend that the estrangement between Phillip and himself relieves him of his duty to meet the boy's educational and other needs" (*Lipsky v Lipsky, supra*, at 364).

In the present case, the father similarly maintains that Joseph abandoned him because, in the wake of the argument which led to the change in custody, he never contacted him or visited him. Like the situation in *Lipsky v Lipsky (supra)*, however, we find that this is a case in which the father bears the responsibility for abandoning his son. The record is virtually devoid of any evidence to demonstrate that the father made a serious effort to visit or establish a relationship with Joseph after he left his home. Indeed, the only evidence that the father ever attempted to see or speak with Joseph was his unelaborated statement that he "tried numerous times" to maintain regular contact. However, this bald assertion falls far short of establishing that Joseph refused to see or speak with his father. In contrast, Joseph testified that he still loved his father, and that, to the best of his knowledge, his father had never attempted to contact him. Under these circumstances, we find that the father failed to meet his burden of establishing that Joseph emancipated himself by abandoning the parent-child relationship. Consequently, the estrangement between father and son does not relieve the father of his support obligation.

## IV

■ Since the addition of Joseph to the mother's household constituted a material change in circumstances which was not anticipated by the parties' stipulation of settlement, we further agree that modification of the father's support obligation was appropriate (*see, Riseley v Riseley,* 173 AD2d 1103; *Matter of Aiken v Aiken,* 115 AD2d 919; *see generally, Matter of Brescia v Fitts,* 56 NY2d 132, 138-140). However, in considering the propriety of the Family Court's child support award, we note that, although the instant modification proceeding was commenced prior to the enactment of the Child Support Standards Act (hereinafter CSSA), the order appealed from

was entered September 12, 1990, nearly one year after the Act went into effect *(see,* Family Ct Act § 413). In view of the paramount interests of children in need of support and because the support guidelines set forth by the statute represent important public policy, we have recognized that the CSSA " 'should be applied to matters which commenced prior to the effective date of the act but which have not yet been finally decided, as here' " *(Matter of Fetherston v Fetherston,* 172 AD2d 831, 834; *see also, Matter of Borgio v Borgio,* 186 AD2d 131). Moreover, the CSSA was amended, effective July 25, 1990, to make application of the guidelines mandatory rather than permissive with respect to modification applications *(see, Matter of Howard v Howard,* 186 AD2d 132; *Matter of Pedersen v Pedersen,* 176 AD2d 729). Since the order appealed from was issued after the effective date of the 1990 amendment, the Family Court should have relied upon the CSSA guidelines in modifying the father's support obligation for the parties' two unemancipated children. We therefore remit the matter to the Family Court for a hearing and determination of an appropriate award of child support in accordance with the provisions of the Child Support Standards Act *(see, Matter of Fetherston v Fetherston, supra; Matter of Borgio v Borgio, supra).*

■ We additionally find, under the circumstances of this case, that the Family Court properly denied the father's application for a downward modification of his spousal maintenance obligation. It is well settled that a party seeking to modify the maintenance provisions of a judgment of divorce in which the terms of a stipulation of settlement have not been merged must establish that the continued enforcement of the maintenance provisions would create an "extreme hardship" (Domestic Relations Law § 236 [B] [9] [b]; *Lewis v Lewis,* 183 AD2d 875; *Wells v Wells,* 130 AD2d 487). Since the hearing record establishes that the father's business income has steadily increased, we cannot conclude that enforcement of the spousal maintenance provision of the stipulation of settlement would create extreme hardship.

■ Finally, we decline to address the petitioner mother's request for certain affirmative relief since, as a general rule, relief on appeal may not be afforded to a nonappealing party *(see, Hecht v City of New York,* 60 NY2d 57; *Matter of Prete v Prete,* 193 AD2d 804; *Stimmel v Stimmel,* 163 AD2d 381, 383).

Accordingly, the order entered September 12, 1990 is modified, by adding a provision sustaining the objection to the

amount of child support awarded and vacating the provision of the order dated March 1, 1990 which awarded child support, and as so modified, the order entered September 12, 1990 is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to the Family Court, Nassau County, for a new determination as to child support in accordance with the Child Support Standards Act (Family Ct Act § 413), and for a determination of arrears, if any. Pending a new determination as to child support, the appellant shall continue to make child support payments to the extent required by the order appealed from.

COPERTINO, J., concurs in the result only, with the following memorandum: Joseph C. is not emancipated, and his father thus is obligated to support him until the age of 21 years (Family Ct Act § 413; *Matter of Roe v Doe,* 29 NY2d 188). However, this conclusion should be based not on any finding of fault on the father's part, but rather on the grounds that Joseph is not self-supporting and that his father effectively consented to and approved a change of living arrangements *(see, Matter of Henry v Boyd,* 99 AD2d 382, *affd* 65 NY2d 645; *Matter of Monroe County Dept. of Social Servs. v San Filippo,* 178 AD2d 1011). When he signed the change of residence form which permitted his son's transfer to West Hempstead High School, the father placed his son in the same position as his unemancipated daughter, Alexandra. In my view, the record allows for no more. The majority opinion strains to establish the father as the true cause of Joseph's exit from his home and thus liable for his son's support, and I cannot endorse that position.

Two key factors are cited by the Court as proof that the father bears the responsibility for what happened to the relationship and that it was he who deliberately kept Joseph away. The first is the testimony of the father regarding the events which led to Joseph's departure. The father testified that as Joseph was leaving the house during the course of their argument he said, "you go out that door, do not come back". This was not a statement that he wanted his son to leave, but rather one warning of consequences if he *did* leave. It was undoubtedly a threat intended to keep Joseph at home under conditions the father found acceptable, but the choice to leave or stay remained Joseph's. Thus, the statement hardly constitutes proof of a direction to leave from a father who no longer wanted his son to live with him. I am similarly unper-

suaded that the testimony concerning police intervention is worthy of the weight attributed to it. The father testified that he would have allowed Joseph back in the house only in the presence of the police. Clearly, this referred to no more than his feelings in the immediate aftermath of the emotional confrontation during which he felt threatened and which led him to call the police in the first place. It was not a policy statement which had a life beyond the events of that night. As the excerpt of testimony cited by the Court indicates, Joseph was in fact allowed back in when the police arrived. In short, the issue for the father was protection during a heated dispute. There is no testimony from which one might reasonably conclude that he meant that he would take his son back only if "forced" to do so by the police, which is implied by the majority opinion.

The second basis advanced for the conclusion that the father was responsible for the break and abandoned his son is the absence of proof that the father made efforts to visit or establish a relationship with his son after the events previously discussed. I find this alleged lack of contact to be of little import. True, there is no hard proof that either father or son tried to repair the damage. However, I would point out that Joseph, unlike his father, admitted that he failed to do so, while his father stated he made attempts. Unlike the case where the child is very young, we are speaking here of a high school student who is capable of thinking and acting on his own, and we cannot assume that he was any less capable of picking up a telephone than was his father. Without any indication from this young man that he wanted to see him, his father cannot be expected to make repeated attempts to force himself on his reluctant offspring. I find this case wholly distinct from one such as *Lipsky v Lipsky* (115 AD2d 361), which is cited by the Court. There, a 12-year-old boy, away from home in summer camp, suddenly found his father gone with no forwarding address given and his support terminated. That was abandonment. This is not.

As noted previously, I agree that Joseph is not self-supporting. However, I also feel constrained to mention that in this area as well the Court is too quick to find fault with the father. Specifically, in discussing how Joseph dissipated and squandered the proceeds of his personal injury settlement, the majority opinion described Joseph's testimony that his father signed the necessary authorization enabling him to receive the money without offering any advice or instruction about how to

use it—the implication being that he should have done so. Given the state of affairs between the two, an intimate chat on the subject would have been anomalous indeed, and the chances of Joseph listening to any advice from his father would seem to render the giving of any such advice an exercise in futility. Moreover, Joseph was 18 years of age, old enough to vote (US Const 26th Amend)—thereby affecting the destiny of all of us—and to enter into binding contracts (see, General Obligations Law § 3-101). In short, he was an adult in the eyes of the law. I can find no reason to pay heed to Joseph's implied and thoroughly disingenuous suggestion that his father should have provided some guidance when he previously had made clear that guidance (as opposed to the cash) was about the last thing he wanted from him. As with contact between them generally, Joseph admitted that he himself made no attempt to speak with his father on the subject.

I would point out that Joseph appears to have been less than forthright in his description of the 1986 altercation with his father. Notwithstanding the fact that this was the key event in their break, Joseph testified that he could not recall what caused the heated quarrel. Combined with his mother's testimony that as of the date of the hearing, he remained a "very troubled young man [who] has difficulty focusing his energies in a constructive way and is angry", I hesitate to place much credence in his version of events.

Accordingly, I agree with the Court that the father is obligated to support Joseph, but not for the reasons set forth in the majority opinion. I concur fully with the Court's determinations with regard to the application of the Child Support Standards Act to a modified child support obligation, the father's application for downward modification of spousal maintenance, and the mother's request for affirmative relief.

BRACKEN, J. P., and BALLETTA, J., concur with EIBER, J.; COPERTINO, J., concurs in the result only in a separate memorandum.

Ordered that the order entered September 12, 1990 is modified, by adding a provision sustaining the objection to the amount of child support awarded and vacating the provision of the order dated March 1, 1990, which awarded child support; as so modified, the order entered September 12, 1990 is affirmed, insofar as appealed from, without costs or disbursements, and the matter is remitted to the Family Court,

Nassau County, for a new determination as to child support in accordance with the Child Support Standards Act (Family Ct Act § 413), and for a determination of arrears, if any; and it is further,

Ordered that pending a new determination as to child support, the appellant shall continue to make child support payments to the extent required by the order appealed from.