OPINION OF THE COURT
Salvatore J. Módica, J.
*840 The petitioner filed the instant petition seeking an order of child support against the respondent. A hearing was held with respect to the petitioner’s application. The petitioner’s application is denied.
On April 1, 2002, the petitioner, Frances W, filed a petition against the respondent, Steven M., seeking support for her niece, Melissa M., who is the daughter of the respondent. The support petition was originally dismissed on September 24, 2002 by a hearing examiner in Queens Family Court. By order of a judge of the Queens Family Court, however, the order of dismissal was vacated on November 13, 2002 and the matter remanded back to the hearing examiner to enter a temporary order of support in accordance with Family Court Act § 434 and for further proceedings. On March 13, 2003, that same Family Court judge stayed the proceedings on the support petition “until such time as a court enters an order providing for temporary or permanent custody or guardianship of the subject child.” As a result, there is no temporary order of support in place as to the instant petition.
Following a custody hearing that lasted almost two years, Referee Ebrahimoff, in a very carefully considered decision, dated May 20, 2005, “reluctantly recommend[ed] custody to Ms. W.”[1] The matter was then referred to Judge Guy DePhillips, who confirmed the Referee’s findings of fact and issued a final order of custody to Ms. W. “for reasons stated on the record . . . [and] based on the child’s wishes and without prejudice to the issue of the child’s emancipation as delineated in the referee’s report.” The matter was then administratively assigned to this court to decide the issue of child support. The court is called upon to decide the following issues: (1) whether, given her conduct toward both the respondent and Melissa, the petitioner should be awarded support on behalf of the child and (2) whether Melissa has abandoned her father, thus relieving Mr. M. of his child support obligation.
The parties appeared before this court on June 26, 2006, at which time it unsuccessfully attempted to settle this case. This *841 court also pointed out to both sides that the doctrine of collateral estoppel might prevent the relitigation of certain facts material to the child support issue. A hearing was eventually held before this court on November 29, 2006. Based upon the evidence presented at that hearing and the findings of fact made by Referee Ebrahimoff, as confirmed by Judge DePhillips, this court declines to issue an order of child support against the respondent.[2]
[3]
The factual findings made by Referee Ebrahimoff reveal that the respondent was married to the petitioner’s sister, Theresa M., who gave birth to Melissa in 1987. Both husband and wife suffered from emotional and psychological problems; Ms. M.’s psychological problems, however, were rather severe and, in addition, she suffered a lifetime of chronic pain. These factors most likely drove Theresa M. to take her own life on October 17, 2000. At some point prior to 1993, Ms. M. filed a matrimonial action seeking a divorce from the respondent and custody of Melissa. At that time, Ms. M. alleged that the respondent had sexually abused Melissa when she was an infant. According to the factual findings of Referee Ebrahimoff, Theresa M.’s emotional problems also led her to believe “that there were worms in her food and that she had a tapeworm growing inside her.” In any event, the sexual allegations made by Theresa M. in the matrimonial action led to the filing of a petition under article 10 of the Family Court Act against the respondent in Queens Family Court. The judge presiding over that action, apparently concluding that the allegations of sexual abuse were baseless, eventually adjourned the case in contemplation of dismissal, granted the respondent supervised visitation with his daughter, and issued a temporary order of protection on Melissa’s behalf. The mother, father, and daughter were then directed to attend counseling, and, in October 1993, that same Family Court judge held that “the ACD was satisfied.” At some point, apparently in 1993, Theresa M. was granted a divorce from the respondent.[3] The stipulation of settlement included liberal overnight visits for the father. “The father’s visits under the *842 . . . divorce settlement would be subject to the rules governing the ACD.”[4]
The sexual abuse allegations made by Theresa M. against the respondent in the matrimonial action did not, however, end with the resolution of that proceeding or the dismissal of the article 10 petition. Referee Ebrahimoff expressly concluded that, “[tjhroughout the history of this case,” Theresa M., aided by her sister, Frances W., repeatedly accused Mr. M. of sexually abusing Melissa. It was quite obvious from the written decision of the Referee, as confirmed by Judge DePhillips, that the allegations made by the two women were fabricated. In the end, the Referee determined that the two women succeeded in destroying the child’s relationship with her father. In reaching this conclusion, Referee Ebrahimoff relied on forensic reports by Ruth Cohen, M.D., who interviewed Melissa and her parents in June 1992 and Dr. N.G. Berrill, who interviewed the child and her parents in May 2000.
Melissa was almost five years old when she was interviewed by Dr. Cohen. At the time, there were proceedings involving Steven and Theresa M. in both the Supreme Court and Family Court and Melissa had refused to visit her father, an unwillingness the mother attributed to the alleged sexual abuse. In the opinion of Dr. Cohen, however, Melissa had not been sexually abused by her father. Her opinion was, in part, based on the “child’s inability to provide details about the alleged incident and the fact that there was no change of affect when the child spoke of the alleged abuse.” Dr. Berrill, who interviewed the family in May 2000, as part of the proceedings in Family Court, was unable to state with certainty if Melissa had been sexually abused by her father. Interestingly, in his report, Dr. Berrill stated that “[tjhis examiner is nonetheless highly suspect of these allegations and remains convinced that other interpersonal and family dynamics can be pointed to, to explain the problems that currently exist with respect to the subject child refusing to visit with her father.”
There were other individuals who reached conclusions that differed from doctors Cohen and Berrill. Nevertheless, Referee *843 Ebrahimoff rejected the evidence presented at the hearing that Melissa had been sexually abused by her father. And, on this record, there were rational and logical grounds for her to have done so. First, the Referee had the opportunity to listen to the testimony and observe the demeanor of the witnesses. Accordingly, she had a firsthand opportunity to evaluate both the evidence presented at the hearing and the testimony given by the witnesses. It is well settled that such credibility determinations are entitled to great weight. (See e.g. Eschbach v Eschbach, 56 NY2d 167, 173 [1982].) Second, she was entitled to give greater weight to the opinions of doctors Cohen and Berrill that the child had not been sexually abused rather than to any evidence that suggested otherwise.
In rejecting evidence that tended to establish that the child had been sexually abused, Referee Ebrahimoff noted that Melissa, who had been in therapy in 2001, informed her therapist in February 2001 that she had been sexually abused by her father when she was 9 or 10 years old. The allegation was reported to the Nassau County Office of Children and Family Services (OAFS), which conducted an investigation and, apparently, determined that there was some credible evidence of the alleged abuse within the meaning of Family Court Act § 651-a. In clearly rejecting the determination of OAFS, Referee Ebrahimoff made the following observations:
“OAFS did not remove Mr. M.’s other child Vicki from his care or offer any services to the father and his family nor was any neglect or abuse case filed in Nassau County. No criminal charges were ever filed. The court also reviewed the caseworker’s notes from this latest set of allegations. No expert ever interviewed the child. The caseworkers wrote the following in their typed notes of 3/22/01: ‘Child stated that other incidents have happened also but does not recall them but she had [been] told [by] her mother abou[t] them when she was young. [When the case]worker asked [the child] how she [knew her father had previously sexually abused her] . . . [Melissa] stated that her mother had told her.’ ”
Not only did Referee Ebrahimoff expressly reject the claim that the child had been sexually abused by her father, her findings reveal that Melissa’s memory of having been sexually abused by her father was implanted by both her mother and the petitioner. Although the Referee did not make the specific finding that the petitioner was the one who initially conceived of *844 the idea to convince Melissa that her father sexually abused her, the findings reveal that the petitioner was as culpable as Theresa M. in destroying the child’s relationship with her father. In this case, the evidence revealed that the petitioner’s sister was mentally unstable and was totally incapable of caring for her daughter; Ms. W was well aware of her sister’s instability. Whether Theresa M. made up the sexual abuse allegations to ensure that she would maintain custody of her daughter or simply because she was suffering from a delusion is unclear. What is clear is that the petitioner, with full knowledge of her sister’s serious psychological or psychiatric problems, chose to believe that Mr. M. had sexually abused his daughter. In selecting this course for her niece, Ms. W. irrationally refused to accept the fact — or the possibility — that the allegation was untrue and that Melissa was simply repeating what her mother had said to her. Instead, the petitioner continued to insist that Mr. M. had sexually abused his daughter and she expressly conveyed her beliefs about the sexual abuse and her negative opinion of Mr. M. to Melissa. In that respect, she intentionally aided her sister in improperly convincing Melissa that Mr. M. had sexually abused her. As noted by Referee Ebrahimoff:
“Ms. W. claims neutrality and good faith in this matter which is not borne out by her behavior during the pendency of this case. Her behavior has included calling the father a child molester in the waiting room of Family Court in front of the child and preventing simple civil contact between Steven M. and Melissa in the same waiting room because it was not a visitation day. She has apparently . . . been the person to call in allegations of sex abuse based on the allegations of her sister Theresa who was not mentally stable. Ms. W. who claims she has the best interests of her niece at heart has shown little insight and has displayed poor judgment. Throughout this case Ms. W has relied on what others have told her and has not exercised any critical thinking nor investigated the allegations before reporting the ‘wrongdoing.’ In contrast, Ms W. admits she overlooked Theresa’s poor parenting and did nothing about it . . .”
In sum, the Referee found that Melissa had not been sexually abused and that Ms. W., persisting in her belief that the father had abused Melissa, worked to undermine the child’s relationship with her father. Nevertheless, despite the Referee’s express *845 finding that Melissa had not been sexually abused by her father, at the hearing held before this court, both Ms. W., who spoke out often during court proceedings, and her attorney insisted that a 1992 examination done of the child by a physician established that the child had been sexually abused. Karen Liquornik, M.D., the physician who performed the examination, testified at a June 24, 1992 deposition (which was conducted as part of the Supreme Court matrimonial action between Theresa and Steven M.) that Melissa had, in fact, been sexually abused.[5]
The deposition of Dr. Liquornik, who had graduated from medical school in May 1891 and had commenced her residency in pediatrics in July 1991, revealed that, on November 29, 1991, while Theresa M. was being treated in a hospital in New York City, Ms. W. and Melissa’s maternal grandmother took the child to the emergency room of Queens Hospital Center. Dr. Liquornik spoke to both women, who informed the doctor that Melissa had been sexually abused; the doctor then spoke alone with the child for “definitely over an hour.” Doctor Liquornik next conducted a vaginal examination of Melissa, who screamed and shook violently during this procedure. In fact, the assistance of “quite a few” medical personnel were needed to keep this traumatized child still while the doctor conducted her examination. Based on “certain statements that Melissa told [Doctor Liquornik] and then based upon the fact that the physical findings . . . [were] consistent with [the] diagnosis ... [of sexual abuse] ... by the father of the child,” Doctor Liquornik concluded that Melissa’s father had sexually abused her.[6] As further explained by the doctor, “Yes, it was consistent with the diagnosis in that it did not go against the diagnosis.”
*846 The child was also checked for any sexually transmitted diseases. Doctor Liquornik observed some redness in the child’s labia majora. There were, however, “no cuts, lacerations, or bleeding” in the genital region. Her vaginal opening was five millimeters, which the doctor testified was “in the range of suspicion.” As this witness testified, “one to three millimeters is normal, 3 to something like 6 is suspicious and above 6 to 7 is maybe not definite abuse but very suspicious.” The doctor did note that the child’s agitation “might [make the size of the vaginal opening] smaller than it actually is.” The doctor also testified that “a lot of 4-year-old girls do have redness from general scratching and yeast infections which are not sexually transmitted.” Doctor Liquornik testified that she also spoke to Melissa’s mother at some point in time that day. Inexplicably, this physician was unable to state whether she had spoken to Melissa’s mother before or after the vaginal examination was performed. In other words, this witness was unable to remember something as important as whether or not she had received permission from the child’s mother prior to conducting a vaginal examination on a four-year-old girl, who was brought into a hospital emergency room not by her mother, a police officer, or a representative from a child protective services, but by her maternal aunt and grandmother. Based upon her “diagnosis,” Doctor Liquornik contacted the Bureau of Child’s Welfare, as the Administration for Children’s Services was known in those days.
Contending that both Referee Ebrahimoff and Judge DePhillips were completely incorrect in their assessment of the evidence presented at the hearing, the petitioner relies on Dr. Liquornik’s deposition as proof that her niece was, in fact, sexually abused. The petitioner’s attempt to establish at the hearing before this court that there is adequate proof that the child was, in fact, sexually abused by her father, must be rejected for two reasons. First, Ms. W. is collaterally estopped from relitigating the issue of sexual abuse that had been resolved against her by Referee Ebrahimoff at the custody hearing. Second, even if this court found the doctrine of collateral estoppel did not apply to this case, given the evidence presented at the hearing and in light of the proceedings that took place before both the Referee and Judge DePhillips, this court would reach the same exact conclusion reached by those courts: namely, (1) that Melissa was *847 never sexually abused by her father and (2) that the petitioner has poisoned the child’s relationship with her father since Melissa was at least four years old. The court reaches this conclusion notwithstanding the deposition of Dr. Liquornik.
“The equitable doctrine of collateral estoppel is intended to reduce litigation and conserve the resources of the court and litigants.” (Matter of Juan C. v Cortines, 89 NY2d 659, 667 [1997] [internal quotation marks omitted].) As noted by the Court of Appeals, collateral estoppel is a “common-law doctrine rooted in civil litigation” and emanates from the basic notion that it is unfair to allow “a party to relitigate . . . issue[s] that ha[ve] already been decided against [that party].” (Matter of Juan C. v Cortines, supra, 89 NY2d at 667-668.) The elements of collateral estoppel are as follows: “[1.] the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and [2.] the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.” (Matter of Juan C. v Cortines, supra, 89 NY2d at 667, quoting Kaufman v Eli Lilly & Co., 65 NY2d 449, 455 [1985].) The party who seeks the benefit of collateral estoppel has the burden of establishing that there are identical issues in both the present litigation and the prior litigation and that the issues were decided in such prior action. The litigant who wants “to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action.” (Matter of Juan C. v Cortines, supra, 89 NY2d at 667, quoting Kaufman v Eli Lilly & Co., supra, 65 NY2d at 456.)
In the proceeding before Referee Ebrahimoff, the specific factual issues that Ms. W attempted to establish in support of her petition for custody of Melissa were that (1) Melissa had been sexually abused by her father and (2), as a result, the child had absolutely no desire to have a relationship with her father. And those issues were vigorously litigated before Referee Ebrahimoff. Although Mr. M. confirmed that Melissa and he do not have any interaction with one another or any normal father-daughter relationship, he unequivocally denied the allegations of sexual abuse. Both at the custody hearing and the hearing before this court, Mr. M. and Melissa’s Law Guardian forcefully argued that there was no credible evidence that the child had ever been sexually abused. They further argued at both proceedings that the evidence established that the child believed that her father had sexually abused her because the child’s mother, *848 aided by Ms. W, had brainwashed the child into falsely believing this. It was that falsely instilled belief, the Law Guardian and the father contended, that ultimately destroyed Melissa’s relationship with her father. Referee Ebrahimoff concluded that the evidence supported the positions advanced by Mr. M. and the Law Guardian. Given the child’s age, however, Referee Ebrahimoff reluctantly awarded Ms. W. custody of Melissa. Judge DePhillips, noting that Ms. W acted as “judge, jury, and executioner,” with respect to Melissa’s relationship with her father, reluctantly confirmed that finding.
The court first finds that Mr. M. has sustained his burden of estabhshing that the factual issues decided in the custody action are necessarily identical to and decisive of the present action before this court. In the court’s view, both the sexual abuse allegations, the petitioner’s inexplicable role in the child’s belief that the respondent had sexually abused her, and the child’s subsequent refusal to have a relationship with her father were factual issues decided in the custody case. Those same issues are necessarily decisive of the support action before this court. (See e.g. Matter of Juan C. v Cortines, supra, 89 NY2d at 659; see also Matter of Suffolk County Dept. of Social Servs. v James M., 83 NY2d 178 [1994].) Specifically, in deciding whether or not to award the petitioner child support on behalf of Melissa, this court is permitted to take into account Ms. W’s egregious conduct toward the respondent and his daughter, which succeeded in destroying his relationship with his daughter and which deprived Melissa and her father of the warmth and affection of one another. (See e.g. Matter of Orange County Dept. of Social Servs. v Meehan, 252 AD2d 588 [2d Dept 1998].) In that sense, the factual issues decided in the custody proceeding concerning Ms. W’s actions in improperly brainwashing Melissa into falsely believing that her father sexually abused her are identical and necessarily decisive of the present action before this court. For this reason, the court concludes that Mr. M. has sustained his burden of proving the first prong of the collateral estoppel test. (See Matter of Juan C. v Cortines, supra, 89 NY2d at 667; see also Kaufman v Eli Lilly & Co., supra, 65 NY2d at 456.)
The court further finds that the petitioner had a full and fair opportunity to contest the prior custody determination. Ms. W was represented by an attorney who advocated vigorously for her. In fact, despite her egregious conduct toward Melissa and her father, Ms. W. was awarded custody of the child. In the *849 court’s view, she has failed to establish that she was deprived a full and fair opportunity to litigate the prior custody determination. (Matter of Juan C. v Cortines, supra, 89 NY2d at 667, citing Kaufman v Eli Lilly & Co., 65 NY2d 449, 455 [1985].) For example, as to Dr. Liquornik’s deposition, the petitioner failed to present adequate proof that she was denied an opportunity to present evidence regarding what Melissa said to this doctor. Finally, there was no indication that she was prevented from calling Doctor Liquornik as a witness at the custody hearing or, assuming its admissibility, introducing the deposition into evidence at that hearing. In other words, there was no evidence presented at the hearing before this court that Ms. W. was denied a full and fair hearing as to her petition for custody because of an erroneous preclusion of critical evidence. (See e.g. People v Sailor, 65 NY2d 224 [1985].) Accordingly, the respondent is collaterally estopped from relitigating the findings made by Referee Ebrahimoff that Ms. W improperly convinced Melissa into falsely believing that her father had sexually abused her and that this conduct ended up ruining Melissa’s relationship with her father.
In any event, even if the doctrine of collateral estoppel is inapplicable to the support case, the court finds that the deposition of Dr. Liquornik does not compel findings different from those reached in the custody determination. If anything, Dr. Liquornik’s deposition supports the findings made by Referee Ebrahimoff. As noted, the deposition reveals that Melissa was taken to an emergency room by her grandmother and Ms. W. at a time when the child’s mother was in the hospital. At the hospital, allegations of sexual abuse were made by the two women and the child to a physician who had barely six months of experience as a medical doctor. More troubling is that this doctor conducted an invasive gynecological examination of a four-year-old girl and was unable to remember whether or not she had spoken to the child’s mother before or after the examination was conducted. Dr. Liquornik’s obvious inexperience revealed that parental permission had not been obtained prior to this examination. The doctor then made a “diagnosis of sexual abuse,” despite the almost total absence of physical signs that Melissa had been sexually abused. Her evaluation was primarily based upon what Melissa had told her. Dr. Liquornik, however, was obviously completely unaware of the claim that Ms. W. and Melissa’s mother had coached the child into making up these allegations. Finally, there is no indication that the doctor was *850 aware of the mother’s mental instability. This court has read Dr. Liquornik’s deposition very carefully. She would not have supported Ms. W.’s claim. Rather, that deposition would have supported the positions advanced by both Mr. M. and the Law Guardian. It would have established how far back in time Melissa was being brainwashed by Ms. W. into believing that her father was touching her inappropriately.
Accordingly, in deciding whether or not to order Mr. M. to pay child support to Ms. W on behalf of Melissa, the court must accept and take into account the established findings made by Referee Ebrahimoff, as confirmed by Judge DePhillips. Those established findings are that Mr. M. has absolutely no relationship with his daughter because of Ms. W.’s improper actions in destroying the child’s relationship with her father and convincing Melissa to believe falsely that her father had sexually abused her. Given that conduct, this court, relying on the Second Department’s decision in Matter of Orange County Dept. of Social Servs. v Meehan (252 AD2d 588 [2d Dept 1998]), finds that Ms. W. has forfeited her right to seek child support from the respondent on behalf of Melissa.
In Matter of Orange County Dept. of Social Servs. v Meehan, the Second Department noted that “[i]t is well settled that a court has the authority to suspend a noncustodial parent’s obligation to pay child support when it finds that the custodial parent has unjustifiably denied the noncustodial parent his or her right to visitation.” (Id. at 590.) In this case, the findings by the Referee revealed that the petitioner not only interfered with Mr. M.’s right to see his daughter, but that she participated in a course of conduct with the child’s mother which succeeded in utterly destroying the respondent’s relationship with his daughter. Of course, in this case, Mr. M. is not requesting this court to suspend or terminate child support; he is asking that the court decline to make an initial child support determination to the petitioner because of her misconduct toward him and his daughter. That factual distinction, however, is meaningless. This court concludes that the Second Department’s decision in Matter of Orange County Dept. of Social Servs. v Meehan should be extended to the facts of this case. And, in light of that decision, this court concludes that the petitioner is not entitled to an award of child support.
Interestingly, there appears to be scant New York case law on this issue. The reason is, perhaps, obvious. Under similar circumstances, an order of custody is usually not warranted to a *851 person who has interfered so shockingly in a child’s relationship with his/her parent. (See Matter of Juliet M., 16 AD3d 211 [1st Dept 2005]; see also Matter of Gago v Acevedo, 214 AD2d 565 [2d Dept 1995]; Matter of Karen PP. v Clyde QQ., 197 AD2d 753 [3d Dept 1993].) This is especially so when the interference involves coaching a child into making up false sexual allegations about the child’s parent. (See Matter of Karen PP. v Clyde QQ., 197 AD2d 753 [3d Dept 1993]; compare Matter of John A. v Bridget M., 16 AD3d 324 [1st Dept 2005].) Of course, Mr. M. was not awarded custody of his daughter and this court is bound by that determination. Nevertheless, the law should not further compound the unusual, but understandable, result reached in the custody case by now requiring Mr. M. to pay child support to Ms. W. In light of Ms. W.’s egregious conduct, the court should not facilitate her further attempt to use the justice system in order to obtain child support from Mr. M.
The result reached by this court is consistent with public policy concerns and notions of fundamental fairness. In that regard, the decision by the Second Department in Matter of Orange County Dept. of Social Servs. is an implicit recognition of fundamental principles of law that courts have occasionally invoked to decide cases. As far back as 1889, the New York Court of Appeals stated that “all laws . . . may be controlled in their operation and effect by general, fundamental maxims of the common law.” (Riggs v Palmer, 115 NY 506, 511-512 [1889].) The Court of Appeals further noted that “[t]hese maxims are dictated by public policy [and] have their foundation in universal law administered in all civilized countries.” (Riggs v Palmer, supra at 512.) In Riggs, the Court was confronted with a situation in which a grandfather, who had left his grandson a substantial portion of his estate in his last will and testament, was murdered by that grandson. (Id. at 511-513.) Invoking the maxim that “[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime” (id. at 511), the Court of Appeals invalidated that portion of the will as it related to the grandson’s bequest. The Court noted that the evidence established that the grandson was aware of the bequest, that the grandfather had manifested an intent to revoke the bequest to his grandson, and that the grandson murdered the grandfather by poisoning him to prevent him from revoking the bequest, and “to obtain the speedy enjoyment and immediate possession of his property.” (Id. at 508-509.)
*852 In this case, the record reveals that the petitioner essentially was an active participant in destroying Melissa’s relationship with her father. Apparently, the child truly believes that she has been sexually abused by her father. And according to an affidavit of Ms. W., dated October 21, 2002, which is part of the court file, the respondent and Melissa have not seen one another since June 14, 1997. What is lost will most likely never be recovered; Ms. W is directly responsible for the loss suffered by both father and daughter. Under these circumstances, the court would be allowing the petitioner to profit by her own fraud or take advantage of her own wrongdoing if it ordered Mr. M. to pay child support to Ms. W. on behalf of Melissa. Given the decision in Riggs, the court declines to award child support to the petitioner.
It must be emphasized that the court’s decision today resolves only that Ms. W is not entitled to benefit from or be compensated for her own wrongdoing and be awarded child support in favor of Melissa. The decision does not resolve whether or not Melissa is entitled to child support directly from her father. At the hearing, the court wished to hear from Melissa. Unfortunately, she was never called as a witness and the court was never able to make a determination as to whether or not she has unreasonably abandoned her father. In other words, insufficient evidence was presented as to whether or not her refusal to see Mr. M. is justified. For this reason, the court is ill equipped to make such a determination. (See e.g. Matter of Benjamin B. v Rivka M., 90 Misc 2d 850 [Fam Ct, Queens County 1977], citing Matter of Roe v Doe, 29 NY2d 188, 193 [1971].) “[S]upport obligations should not be suspended if the child is too young or immature to be held responsible for the consequences of the refusal.” (See Besharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 447, at 458; see also Rosemary N. v George B., 103 Misc 2d 1036, 1037 [Fam Ct, Dutchess County 1980] [“where (18-year-old) child willfully refuses to visit with the noncustodial parent, such unjustified refusal should not be condoned by the court”]; Matter of Walsh v Karamitis, 291 AD2d 749 [3d Dept 2002]; Radin v Radin, 209 AD2d 396 [2d Dept 1994]; see also Matter of Alice C. v Bernard G.C., 193 AD2d 97, 109 [2d Dept 1993].)
And even if the record in the custody proceeding suggests that Melissa has abandoned her father, the court finds that the child should not be estopped or prevented from pursuing her own petition against her father. Again, fundamental notions of *853 fairness compel this result. It must be emphasized that Melissa has been under the control of her aunt since she was a very young girl. Given the improper influence exercised by the petitioner, Melissa’s Law Guardian correctly took positions antagonistic to those advanced by Ms. W., both at the custody and support proceedings. At the hearing before this court, the Law Guardian did not fully address whether or not Melissa’s refusal to see her father is reasonable within the meaning of the law. Now that Ms. W.’s financial control over the child has been severed by the decision of this court today, Melissa, who has been victimized by her aunt’s conduct, may now be comfortable with the prospect of having a warm relationship with her father. Accordingly, given these circumstances and that “[t]he support duty is owed to the child,” if Melissa wishes to file a support petition against Mr. M., she is entitled to do so on her own. (Besharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 413, at 84.) With respect to that petition, Mr. M., if he so desires, may present evidence that this child, who has been brainwashed against her father by the petitioner since, at least, the age of four, has unjustifiably and unreasonably abandoned her father.
Finally, it should be noted that it appears that Mr. M. apparently stopped paying child support to Melissa’s mother under the Supreme Court support order that was issued as part of the matrimonial action. It should also be noted that the petition before this court is one for an original child support determination; it is not an enforcement petition. Of course, Ms. W. could have filed a petition to enforce any arrears that had accrued as to the Supreme Court order. (See Family Ct Act § 434; see also Family Ct Act § 422 [a]; § 453 [a].) For reasons unknown to this court, however, the support petition filed by the petitioner was one for an original child support determination. Although this opinion should in no way be construed to mean that Ms. W. should be awarded any arrears that have accrued on behalf of Melissa, it in no way precludes Melissa, who will be 20 years old in 2007, from filing that petition herself. (See Family Ct Act § 453 [a].)
In that regard, the parties should also be aware that, pursuant to Family Court Act § 451 and the Court of Appeals decision in Matter of Dox v Tynon (90 NY2d 166 [1997]) interpreting this statute, a court has no authority to modify or annul the arrears that have accrued from a child support order. Specifically, Family Court Act § 451 states that a “court . . . may modify, set *854 aside or vacate any order issued in the course of [a child support] proceeding, provided, however, that the modification, set aside or vacatur shall not reduce or annul child support arrears accrued prior to the making of an application pursuant to this section.” As noted in Dox, based on the legislative amendments of 1980 and 1981, where a parent defaulted on child support, a court may relieve such parent from a support judgment “only if the defaulting [parent] could establish good cause for having failed to request downward modification of support obligations prior to the accumulation of arrears.” (Id. at 172.) The Legislature, however, was not so generous to defaulting parents when it enacted the New York State Support Enforcement Acts of 1986 and 1987. In interpreting these two acts, the Court of Appeals noted:
“The purpose of the recent revisions was to ‘preclude [ ] “forgiveness” of child support arrears to ensure that respondents are not financially rewarded for failing either to pay the order or to seek its modification.’ Under the present enforcement scheme, then, ‘[n]o excuses at all are tolerated with respect to child support.’ Child support arrears must be awarded in full, regardless of whether the defaulter has good cause for having failed to seek modification prior to their accumulation. ‘If a party obligated to pay child support wishes to avoid making payment, such as where his or her financial circumstances have deteriorated, that party must make an affirmative request for relief.’ ” (Id. at 173-174 [citations omitted].)
Thus, to the extent that there is a Supreme Court child support order, Melissa may file a petition to enforce any arrears accrued as to that order. With respect to Ms. W, her request for an order of child support from Mr. M. is denied.
The Law Guardian is directed to provide Melissa with a copy of this decision and to then explain to her that she has the right to file her own support petition or enforcement petition against Mr. M.
The petitioner’s application for child support, however, is denied.

. Referee Ebrahimoff first held a hearing under Matter of Bennett v Jeffreys (40 NY2d 543 [1976]). After finding the existence of extraordinary circumstances, which provided the petitioner with standing to seek custody of her niece, the Referee next concluded that the best interests of the subject child required an award of custody to the petitioner. That recommendation was confirmed by Judge DePhillips on the record on June 28, 2006. This court has carefully examined the transcript of the June 28th proceeding. Despite the adverse ruling against him, Mr. M. has never filed a notice of appeal.

. It should be clearly noted that this court never prospectively prevented either side from calling any specific witness or introducing any particular piece of evidence at the hearing. On June 26, 2006, this court noted on the record that the doctrine of collateral estoppel certainly might be determinative of certain facts decided by Referee Ebrahimoff, as confirmed by Judge DePhillips.

. As noted by the Referee, the allegations of sexual abuse were “one of the original bases for the mother’s application for a divorce . . . [Neverthe *842 less, such] allegations were not the bases upon which the divorce was granted.”

. On page 3 of her written decision, Referee Ebrahimoff was obviously troubled by what she described as a pattern of litigation between the mother and father, wherein serious allegations of sexual abuse would be levied against the father by the mother, who would ultimately agree to settle the case with unsupervised overnight visitation between Melissa and her father.

. Both Ms. W and her attorney requested that this deposition be admitted into evidence since it had not been considered by Referee Ebrahimoff in making her determination. This court reserved decision on that application. Following the hearing, this court sent a written question to the three attorneys involved in the case, as well as Referee Ebrahimoff. The court inquired of the attorneys and the Referee as to whether or not the June 24, 1992 deposition was admitted into evidence at the hearing before Referee Ebrahimoff. The response from the parties was that this deposition had not been admitted into evidence at that hearing. The petitioner’s request is granted; this court will consider the June 24, 1992 deposition for purposes of this decision.

. During the interview, the child, using a doll, pointed to her genital area and stated to Doctor Liquornik that her father touched her there. The child also stated that when she visited her father at his house, she sometimes slept in his bed and that sometimes he bothered her in the morning; and, pointing to the area between the doll’s legs, the child stated that her father touches her there. Melissa also told the doctor that there is a secret between her and her father which she is not allowed to tell anybody. Finally, Melissa, who was then *846 four years old, told the doctor that the things she and her father do together are “disgusting.”